## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

UNITED STATES OF AMERICA,

v.                                                    CASE NO.: 4:23-cr-90

VICTOR MCMILLAR,

Defendant.

## O R D E R

Following his conviction on two counts of possession of a firearm by a felon, Defendant filed a Motion for New Trial and Judgment of Acquittal.  (Doc. 149.)  The Government responded in opposition to Defendant's Motion.  (Doc. 158.)  After careful consideration, the Court **DENIES** Defendant's Motion.

## BACKGROUND

The grand jury of this District indicted Defendant with two counts of possessing a Smith and Wesson .40 caliber pistol ("the pistol") and ammunition.  (Doc. 3.)  The pistol was used to shoot two people, Donte and Desiree Chisolm, on the night of November 3, 2018, and it was found on the body of another shooting victim, Jamall Johnson, on November 5, 2018.    Donte Chisolm and Johnson both died from their gunshot wounds.  The Government's theory of the case was that the Defendant shot the Chisolms with the pistol and then shot Johnson with another firearm two days later and planted the pistol on Johnson.  To support this theory, the Government introduced 178 exhibits and testimony of twenty-one witnesses during a four-day trial.  (Docs. 153–156.)  The jury found the defendant guilty of possessing the pistol and ammunition on November 3, 2018— as charged in Count One—and November 5, 2018—as charged in Count Two.

Defendant attacks the verdict on several grounds in his current Motion.  First, he contends that Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Special Agent Ichiro Vance lied to the grand jury.  (Doc. 149, pp. 3–5.)  Second, Defendant argues that the Government did not prove that he knowingly possessed a firearm and ammunition or that the ammunition he allegedly possessed traveled in interstate commerce.  (Id. at pp. 5–7.)  Third, he claims inadmissible evidence of the two shootings tainted his trial.  (Id. at pp. 7–9.)  Fourth, Defendant contends the Court should have excluded evidence of two text messages Johnson sent him.  (Id. at pp. 9–10.)  Fifth, he argues that the Court improperly excluded evidence of his acquittal on state charges arising from the shootings.  (Id. at p. 10.)  Lastly, he maintains the cumulative effect of all these errors prejudiced him to the point of violating his right to a fair trial.  (Id. at pp. 10–11.)

## DISCUSSION

"Under Federal Rule of Criminal Procedure 33(a), 'the court may vacate any judgment and grant a new trial if the interest of justice so requires.'"  United States v. Pitts, No. 4:19-CR-12, 2019 WL 3408817, at *1 (S.D. Ga. July 26, 2019).  "Recognized grounds for a new trial include circumstances where substantial and prejudicial evidentiary errors were committed at trial . . . ."  United States v. Rothwell, No. 3:17CR112/MCR, 2018 WL 11251343, at *4 (N.D. Fla. June 18, 2018) (citing United States v. Hawkins, 905 F.2d 1489, 1493 (11th Cir. 1990)).  But courts should grant new trials "sparingly and with caution, doing so only in those really exceptional cases."  United States v. Martinez, 763 F.2d 1297, 1313 (11th Cir. 1985).  New trials are granted only where circumstances occurred that rendered the trial prejudicially unfair.  Id. at 1315.

A motion for judgment of acquittal under Federal Rule of Criminal Procedure 29 "is a direct challenge to the sufficiency of the evidence presented against the defendant."  United States v. Aibejeris, 28 F.3d 97, 98 (11th Cir. 1994).  In considering a motion for judgment of acquittal,

the Court views the evidence in the light most favorable to the verdict.  <u>United States v. Sellers</u>, 871 F.2d 1019, 1021 (11th Cir. 1989).  Moreover, "the court must assume the truth of the Government's evidence."  <u>United States v. Pate</u>, No. CR118-008, 2019 WL 1244722, at *3 (S.D. Ga. Mar. 18, 2019) (citing <u>Martinez</u>, 763 F.2d at 1312).  The issue before the Court is "whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt."  <u>Sellers</u>, 871 F.2d at 1021 (citing <u>United States v. O'Keefe</u>, 825 F.2d 314, 319 (11th Cir. 1987)).  The verdict must stand "unless no trier of fact could have found guilt beyond a reasonable doubt."  <u>United States v. Pinerio</u>, 389 F.3d 1359, 1367 (11th Cir. 2004) (citation omitted).

I.    **Whether Vance's False Grand Jury Testimony Warrants a New Trial or Acquittal**

Vance was the Government's primary case agent.  He testified falsely to the grand jury on two points: (1) that he listened to a recording of law enforcement's first interview of witness Javaree Rowe; and (2) that the same pistol committed both shootings.  The Court reviews Vance's falsehoods before discussing whether they warrant relief.

A.    **Vance's False Grand Jury Testimony**

1.    **Vance's False Testimony that he Listened to a Recording of Javaree Rowe's November 4, 2018, Interview**

Rowe was a key witness for the Government at trial and before the grand jury.  At trial, Rowe testified that he was a friend of Defendant and Johnson. (Doc. 154, pp. 127–28.) According to Rowe, at the time of the first shooting on November 3, 2018, he and Defendant were on the porch of a house located at 210 West 61st Street in Savannah, Georgia, and Johnson was on the porch of a house across the street.  (<u>Id.</u> at pp. 134–42.)  Rowe testified that shortly after the Chisolms approached the area in their vehicle, shots rang out from the porch of 210 West 61st

Street to Rowe's left side, an area where only Defendant was standing.  (Id. at pp. 142–45.)  Rowe gave similar testimony to the grand jury.  (See Rowe Grand Jury Testimony.)[1]

Vance was the only law enforcement officer who testified to the grand jury.  The following is the entirety of Vance's grand jury testimony about Rowe:

Q      Let's go to the next witness, JaVaree Rowe.  Was JaVaree Rowe interviewed by law enforcement multiple times?

A      Yes.

Q      Did you review written reports by local law enforcement summarizing both of these interviews?

A      Yes.

Q      **Did you also personally listen to both of Rowe's interviews?**

A      **Yes.**

Q      Were the statements that JaVaree Rowe provided to law enforcement consistent on both interviews?

A      No.

Q      **Let's discuss the first statement on the first interview of JaVaree Rowe. Is there a recording of this interview?**

A      **There is.**

Q      **Again, did you personally listen to the interview?**

A      **Yes.**

Q      **What is the date of that first interview with JaVaree Rowe and local law enforcement?**

A      **One moment.  November 4th, 2018.**

Q      Special Agent Vance, will you please summarize what JaVaree Rowe said about where he was on November 3rd of 2018 in his first interview with law enforcement?

---

[1]  The Court **DIRECTS** the Clerk of Court to attach Rowe and Vance's grand jury testimony as exhibits to this Order.  The Court **DIRECTS** the Clerk to restrict access to those exhibits to the Court and the parties.

A  In summary, he stated that he was at a store down the street when he heard shots fired from down on 61st Street.

Q  In the first interview with law enforcement, does JaVaree Rowe say he was at the scene of the shooting on November 3rd, 2018?

A  I'm sorry, would you repeat?

Q  In the first interview with local law enforcement, does JaVaree Rowe say he was at the scene of the shooting on November 3rd of 2018?

A  No.

Q  Okay. I now want to discuss his second interview, the second interview with JaVaree Rowe by local law enforcement. Is there a written report which summarizes this interview?

A  Yes.

Q  Did you review this report?

A  Yes.

Q  And did you also personally listen to the second audio - - or the second interview of JaVaree Rowe?

A  Yes.

Q  Okay. Special Agent, I'm going to ask you to go to Exhibit Number 1, Government's Exhibit Number 1, Page 13 of 17 in Government's Exhibit Number 1.

A  One moment. All right.

Q  Can you please tell me the date?

A  The date is Thursday, December 13th, 2018.

Q  Okay. And just again to clarify, this Exhibit Number 1 is a report by Detective Rico Jordan?

A  Yes.

Q  With the Savannah Police Department?

A      Yes.

Q      Okay.  Can you read what the report says concerning the second interview with JaVaree Rowe and local law enforcement?

A      Detective Jordan states as follows in this report: JaVaree Rowe, a witness to 201 West 61st Street homicide, was interviewed by Detective Wood and Detective Schroyer.   The interview was audio recorded.   Below is a summary of the audio recording - - recorded interview and is not verbatim. Mr. JaVaree Rowe stated he was dodging bullets ever since the shooting on West 61st Street.  He stated he saw, quote, "Vic," Victor McMillar produce a firearm and begin shooting at Donte Chisolm.  Mr. Rowe stated that he was scared for the first time he spoke with detectives because "Black," Jamall Johnson, was shot to death less than 48 hours later.  He also stated Mr. Johnson does not know anyone on the East Side and would never go to that area.  Mr. Rowe stated that he spoke to a male that goes by the name "Little Papa," who informed him that Mr. McMillar asked Mr. Johnson to come pick him up from Alford Street so that they could go sell a firearm to Little Papa on the East Side. Little Papa told Rowe that he never spoke with Mr. McMillar about buying a gun from him.  This concludes the audio recording with JaVaree Rowe.

Q      So your testimony is that in the report by Detective Rico Jordan from JaVaree Rowe's second interview, he states that he was on the scene of the shooting on November 3rd, 2018?

A      Yes.

(Vance Grand Jury Testimony, pp. 14–17 (emphasis supplied).)

Vance's testimony that he listened to Rowe's first interview conducted on November 4, 2018, was false.  Former Savannah Police Department Investigator Ashley Wood interviewed Rowe on November 4, 2018, and her summary of that interview indicates she recorded it.  But Vance could not have listened to that recording because, if it ever existed, law enforcement lost it before Vance's involvement in the case.  As the Government admits in its Response, "[t]hat interview was noted in SPD reports and indicated that it was recorded; but no recording of that interview has been located, despite efforts by federal investigators.  Thus, SA Vance was mistaken when he said he listened to that interview."  (Doc. 158, p. 9; see also, doc. 155, pp. 176, 178, 183–

84 (Government's counsel explaining recording's nonexistence at trial); doc. 149-1, p. 10 (Defendant's state counsel asserting in September 2023 recording was missing).)

The Government theorizes that "it is probable that when SA Vance testified in the grand jury and later at trial that he listened to the first interview, he was confused or mistaken, not intentionally misleading." (Doc. 158, p. 10.) The Government claims Vance confused Rowe's November 4, 2018, interview, with statements Rowe gave on December 12, 2018, that were captured in two recordings. (Id. at pp. 9–10.)

The Government's explanation of Vance's false testimony does not hold water. The totality of Vance's grand jury testimony makes clear that he testified about Rowe's November 4, 2018, interview using Wood's report while falsely claiming he listened to the interview.[2] The prosecutor repeatedly clarified that she was asking Vance about the "first interview," and Vance repeatedly and unequivocally testified that he listened to a recording of that interview. (Vance Grand Jury Testimony, pp. 14–17.) Moreover, Vance, not the prosecutor, identified November 4, 2018, as the date of the first interview he listened to. (Id. at p. 15.) If that were not enough, Vance's description of the interviews he listened to makes abundantly clear that he was claiming to have listened to two distinct interviews which occurred on two different dates and during which Rowe gave two different stories. But in the two recordings of Rowe from December 12, 2018—which capture an initial encounter in the field and a follow up at the police station—Rowe told a largely consistent story. What's more, Vance testified that in the first interview he listened to, Rowe did not place himself at the scene of the Chisolms' shooting. (Id.) This is consistent with

---

[2] As discussed below, Vance likely claimed he personally listened to the interview to separate himself from Wood who was indicted for falsifying inculpatory information against suspects including Defendant. (See, Def. Tr. Ex. 5.) Throughout this case, the Government sought to distance Vance's investigation from Wood. (See Vance Grand Jury Testimony, pp. 40–41; doc. 155, p. 203 (Vance testifying at trial that he did not rely on Wood's reports)).

Wood's report of Rowe's November 4, 2018, interview, but inconsistent with the December 12, 2018, recordings. In both recordings from December 12, 2018, Rowe said he was at the scene of the Chisolms' shooting. Thus, Vance could not have been testifying about one of the December 12, 2018, interviews when he said he listened to an interview of Rowe where Rowe did not place himself at the scene of the Chisolms' shooting. Other facts further bely the claim that Vance merely confused the November 4, 2018, interview with one of the recordings from December 12, 2018. For instance, the interview on November 4, 2018, occurred before Johnson was killed, and in the recordings from December 12, 2018, Rowe talked about that shooting.

Having carefully reviewed the entirety of the record, the Court reaches an unfortunate but unmistakable conclusion: ATF Special Agent Ichiro Vance lied to the grand jury when he testified that he listened to a recording of Rowe's November 4, 2018, interview.[3]

## 2. Vance's False Testimony that the Same Pistol Performed Both Shootings

Vance also falsely testified to the grand jury that the same firearm was used to shoot the Chisolms on November 3, 2018, and Johnson and November 5, 2018. (Id. at p. 48.) He asserted that local law enforcement had shell casings from both crime scenes analyzed and that analysis concluded the shells were fired from the same gun. (Id. at pp. 37–39; 49–50.) But as the Government explains in its Response,

> The Chatham County District Attorney's Office did not compare the ammunition
> found at the scene of the November 5, 2018 shooting to subject firearm. And, at
> the time of the grand jury presentation, the United States did not yet have time to
> submit these items for further testing. See Tr. vol. 3 at 193 (SA Vance trial
> testimony that when he testified in the grand jury he was at the beginning of his

---

[3] Vance also lied at trial that he listened to a recording of the November 4, 2018, interview. (Doc. 155, pp. 175–76.) Defense counsel asked, "And to be 100 percent clear for the record here today, your testimony here today is also that you personally listened to the interview of Javaree Rowe that took place on November 4th of 2018?," and Vance responded, "Yes." (Id. at p. 176.) Counsel followed up, "[y]ou listened to it?," and Vance responded, "I did." (Id.) After a recess, Vance testified that he "might have been mistaken in the particular date in question." (Id. at p. 190.) While watching Vance testify, the Court observed that he lacked credibility on these points.

investigation and was going off the information he had at the time, and that he subsequently sent the evidence to be tested and learned that the shell casings from the November 5, 2018 incident did not match subject firearm). SA Vance submitted the request to GBI to test those items on approximately December 13, 2023.

(Doc. 158, p. 11.)

The Government explained that Vance's false testimony was because of his confusion over fifteen shell casings that were recovered from a separate scene on October 30, 2018. (Id. at pp. 11–13.) Those fifteen casings were analyzed alongside the pistol and eleven shell casings recovered from the November 3, 2018, crime scene. (Id.) The Government posits that Vance mistakenly assumed the fifteen casings were from the November 5, 2018, crime scene. (Id.)

The Government's explanation on this point seems plausible. The forensic analysis report that Vance apparently relied on only lists the shell casings by evidence number. (See doc. 158-1.) The report also lists Johnson as the victim. (Id.) Thus, Vance's false testimony was likely due to his failure to ensure that the evidence numbers listed on the forensics report matched the evidence numbers from the November 5, 2018, shooting. Put another way, Vance's false grand jury testimony that the same firearm was used to commit both shootings was likely due to indolence and not intentional deception.[4]

---

[4] Vance did not employ the attention to detail expected of a federal law enforcement officer. If Vance simply looked at the outside of the evidence packet for the shell casings recovered from the November 5, 2018, shooting scene, he would have readily seen that ten, not fifteen, casings had been recovered, and that those casings had not been sent off for analysis. (See Gov. Tr. Ex. 81.) Further, on November 3, 2023, two days after testifying to the grand jury, Vance filled out a chain of custody form for the ten shell casings recovered from the November 5, 2018, shooting scene. (Id.) At that point, he knew the casings had not been sent for analysis. But he apparently made no effort to alert prosecutors or to otherwise correct the grand jury testimony he had just given to the opposite.

**B.    Whether Vance's Grand Jury Testimony Warrants Relief**

**1.  Defendant Forfeited his False Testimony Arguments**

Federal Rule of Civil Procedure 12(b)(3) provides that certain "defenses, objections, and requests must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits . . . ."  Included in this list are "defect[s] in instituting the prosecution, including . . . an error in the grand-jury proceeding."  Fed. R. Crim. P. 12(b)(3)(A).  As the Government notes, because Defendant did not raise his arguments about Vance's false grand jury testimony before trial, he has forfeited those arguments under Rule 12(b).  (Doc. 158, pp. 6–7 (citing United States v. Gonzalez, 834 F.3d 1206, 1218–19 (11th Cir. 2016.)  But the Court may consider the arguments if Defendant shows good cause.  Fed. R. Crim. P. 12(c)(3).  He has not.  Defendant received transcripts of the grand jury proceedings before trial and, thus, was aware of Vance's falsehoods.  He has not stated why he did not challenge the grand jury process and resulting indictment before trial.  Thus, the Court denies this portion of his Motion.  In an abundance of caution, the Court assesses the substance of Defendant's arguments.

**2.  Vance's False Grand Jury Testimony did not Violate Giglio**

Defendant argues that under Giglio v. United States, 405 U.S. 150, 155 (1972), Vance's false grand jury testimony violated Defendant's right to due process.  (Doc. 149, pp. 3–5.)  Putting aside whether Giglio applies to grand jury proceedings, Vance's false testimony before the grand jury does not rise to the level of a Giglio violation warranting a new trial, acquittal, dismissal of the indictment, or other relief.  "In order to succeed on a Giglio challenge, the defendant must demonstrate that the prosecutor 'knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony, and that the falsehood was material.'"  United States v.

Vallejo, 297 F.3d 1154, 1163–64 (11th Cir. 2002) (quoting United States v. Dickerson, 248 F.3d 1036, 1041 (11th Cir. 2001)).   The materiality element is satisfied "if there is a reasonable likelihood the false testimony could have affected the judgment of the jury."   United States v. McNair, 605 F.3d 1152, 1208 (11th Cir. 2010).

Vance's testimony that he listened to a recording of Rowe's November 4, 2018, interview meets the falsity element, but it does not meet the prosecutorial knowledge or the materiality requirement.  Agent Vance knew that he had not listened to a recording of that interview.  But it seems the prosecutors did not know this before the grand jury returned the Indictment.  Nor can the Court infer prosecutorial knowledge.  The written report reflected the interview had been recorded, and there is no indication that federal prosecutors then knew that the recording was lost.

In any event, Agent Vance's lie that he listened to Rowe's November 4, 2018, interview could not have reasonably affected the grand jury's decision.  Whether Vance relied on his direct knowledge of evidence or the local investigating officer's summary matters more in this case than most.  The grand jury may have been less likely to find Vance's testimony trustworthy if they knew he was relying on the report of Wood who had been indicted for falsifying inculpatory information against Defendant.   All the same, Vance described Rowe's first interview as exculpatory of Defendant. (Vance Grand Jury Testimony, pp. 14–15.) Vance testified to the grand jury that during that interview, Rowe did not place himself near the scene of the November 3, 2018, shooting. (Id.) This cut against Rowe's later statement and testimony that he witnessed the shooting and that the shots came from the area where Defendant alone was standing.  Moreover, Rowe testified to the grand jury.  Thus, the grand jurors could judge his account for themselves.

Agent Vance's testimony that the same firearm was used to commit both shootings also meets the falsity element, but it does not meet the prosecutorial knowledge or materiality

requirements.  The Government's explanation that Vance's false testimony on this point resulted from his misinterpretation of the forensics report makes some sense.  Even if Vance knew the shell casings from the November 5, 2018, shooting had not been tested, it does not appear federal prosecutors knew this before the grand jury returned the Indictment.  In any event, while Vance's false testimony on this point comes close to the materiality element, it does not meet it.  The grand jury heard other evidence supporting Count Two including evidence that: Defendant's and Johnson's phone records showed that Defendant was in contact with Johnson before the November 5, 2018, shooting; Defendant travelled with Johnson directly before the shooting; Defendant was in the area of the shooting at the time of the shooting and left the area directly afterward; it appeared the pistol had been tucked or placed into Johnson's waistband by someone else; and Defendant's DNA was on the pistol when it was found on Johnson's body.  (Vance Grand Jury Testimony, pp. 20–21, 26–31, 39–43, 48.)  Additionally, the trial jurors found Defendant guilty beyond a reasonable doubt even though they knew that the pistol was *not* used to commit the later shooting. Thus, it stands to reason that the grand jury would have found the Government met the lower threshold of probable cause to indict even without Vance's false forensics testimony.

### 3. Whether Vance's False Grand Jury Testimony Constitutes Prosecutorial Misconduct

Defendant grounds his arguments about Vance's false testimony in <u>Giglio</u> and its progeny. (Doc. 149, pp. 3–4.)  But in its Response, the Government relies on several cases that analyze similar arguments through the lens of prosecutorial misconduct.  (Doc. 158, pp. 13–15 (citing <u>United States v. Akel</u>, 337 F. App'x 843, 858 (11th Cir. 2009); <u>United States v. DiBernardo</u>, 775 F.2d 1470, 1475 (11th Cir. 1985); <u>United States v. Gibbs</u>, 662 F.2d 728, 730 (11th Cir. 1981)).) Defendant did not cite these cases, and the parties do not discuss whether these cases are derivative

of <u>Giglio</u> or a separate framework for addressing Vance's false statements.  The Court briefly

assesses whether Defendant successfully attacks his conviction under this precedent.

The Eleventh Circuit has explained,

> "[T]he possibility that a witness may have given false testimony before the grand jury does not automatically vitiate an indictment based on that testimony; to dismiss an indictment the district court must also find an abuse of the grand jury process such as perjury or government misconduct."  [<u>DiBernardo</u>, 775 F.2d at 1475 ].  To make out a claim of prosecutorial misconduct regarding the use of false testimony, a defendant must establish that the prosecutor "knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony, and that the falsehood was material." <u>United States v. Woodruff</u>, 296 F.3d 1041, 1043 n.1 (11th Cir. 2002).  Perjury is defined as testimony "given with the willful intent to provide false testimony and not as a result of a mistake, confusion, or faulty memory." <u>United States v. Ellisor</u>, 522 F.3d 1255, 1277 n.34 (11th Cir. 2008); <u>see also</u>, <u>United States v. Singh</u>, 291 F.3d 756, 763 (11th Cir. 2002).  "Conviction beyond a reasonable doubt without the use of the tainted testimony or alleged misconduct at trial makes it highly improbable that the grand jury indictment was based on insufficient probable cause."  <u>United States v. Garate–Vergara</u>, 942 F.2d 1543, 1550 (11th Cir. 1991).

<u>Akel</u>, 337 F. App'x at 858.  As detailed above, there is no indication that the prosecutors presenting

the case to the grand jury knew of Vance's falsehoods.  Also, whether Vance listened to Rowe's

first interview or merely summarized it from a report could not have reasonably affected the grand

jury's analysis.  While Vance's false ballistics testimony is a closer call, the trial jury convicted

Defendant of both counts without that false testimony and with the corrected information that the

shootings were committed with different firearms.  Thus, it is "highly improbable that the grand

jury indictment was based on insufficient probable cause." <u>Garate-Vergara</u>, 942 F.2d at 1550.

The Court is troubled by Vance's falsehoods.  Afterall, "complete candor is the bedrock of

our judicial process." <u>Biggers v. Toppings</u>, No. 6:12-CV-115, 2013 WL 5739077, at *4 (S.D. Ga.

Oct. 22, 2013).[5]  But Vance's untruths did not so erode that bedrock as to warrant overturing of

---

[5] In future prosecutions involving Agent Vance, the Government may have an obligation to disclose that Vance lied to the grand jury and the trial jury.  Because this case is being prosecuted by the United States Attorney's Office of another district, the Court **DIRECTS** Government's counsel to ensure that the Acting

Defendant's conviction.  Thus, the Court **DENIES** Defendant's Motion based on Vance's false

grand jury testimony.[6]

**II.     Whether the Government Introduced Sufficient Evidence that Defendant Knowingly Possessed a Firearm and Ammunition and that the Ammunition Traveled in Interstate Commerce**

Granting a defendant a new trial based on insufficiency of the Government's evidence is

an extraordinary remedy that courts seldom employ.

> On a motion for a new trial based on the weight of the evidence, the court need not view the evidence in the light most favorable to the verdict.  It may weigh the evidence and consider the credibility of the witnesses.  United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980); United States v. Simms, 508 F. Supp. 1188, 1202 (W.D. La. 1980).  If the court concludes that, "despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury."  Lincoln, 630 F.2d at 1319.
>
> The decision to grant or deny a new trial motion based on the weight of the evidence is within the sound discretion of the trial court.  An appellate court may reverse only if it finds the decision to be a clear abuse of that discretion.  Id.; United States v. Indelicato, 611 F.2d 376, 387 (1st Cir. 1979).  While the district court's discretion is quite broad, there are limits to it.  The court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable.  Simms, 508 F. Supp. at 1202.  The evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand.  Indelicato, 611 F.2d at 387; United States v. Sinclair, 438 F.2d 50, 51 n.1 (5th Cir. 1971) (quoting Wright, Miller & Cooper, Federal Practice and Procedure: Criminal § 553, at 487).  Motions for new trials based on weight of the evidence are not favored.  Courts are to grant them sparingly and with caution, doing so only in those really "exceptional cases."  Lincoln, 630 F.2d at 1319; Indelicato, 611 F.2d at 387; Simms, 508 F. Supp. at 1202.

---

United States Attorney for the Southern District of Georgia and the Acting Director of the ATF receive a copy of this Order.

[6] Defendant does not base his Motion on Vance's false trial testimony regarding Rowe's first interview. Even if Defendant had, the Court would deny the Motion.  Vance's false trial testimony was not solicited by the prosecutors but elicited by defense counsel on cross-examination.  Additionally, whether Vance listened to Javaree Rowe's interview could not have been material to the to the trial jury's verdict, because Vance described Rowe's first interview as exculpatory.  Perhaps most importantly, the jury heard from Rowe directly, and he was cross examined on his prior statements including his first interview.

Martinez, 763 F.2d at 1312–13.

This case is not one of those "exceptional cases" where the evidence "preponderates heavily against the verdict."  The evidence against Defendant included: Desiree Chisolm's eyewitness description of the November 3, 2018, shooting including a physical description of her assailant that matched Defendant; Rowe's testimony that the shots fired during the first shooting came from a place where only Defendant was standing; physical evidence including spent shell casings recovered from the area where Rowe testified Defendant was standing during the first shooting; forensic and photographic evidence that tied the pistol to both shootings; evidence that Defendant's DNA was found on the pistol recovered from the second shooting; a picture found on Defendant's phone of several guns, including one that looked to be the pistol; and electronic evidence including cell phone location information that showed Defendant was with Johnson and in the area of the November 5, 2018, shooting directly before and during the shooting.  This evidence sufficiently proved that (1) Defendant possessed the pistol and the ammunition that he used to shoot the Chisolms on November 3, 2018; (2) Defendant possessed the ammunition he used to shoot Johnson on November 5, 2018; and (3) Defendant possessed the pistol on November 5, 2018, when he planted it on Johnson.

Defendant also argues that "the Government failed to put forward evidence that the ammunition it alleged that Mr. McMillar possessed had traveled in or affected interstate commerce."  (Doc. 149, p. 7.)  ATF Special Agent George Jusino testified that he examined the ammunition collected from both crime scenes and placed into evidence.  (Doc. 154, pp. 234–237.) Jusino explained that all those shells were manufactured outside of Georgia and thus travelled in interstate commerce.  (Id.)  Defendant did not object to Jusino's testimony, and he fails to

acknowledge it in his Motion much less explain why that testimony did not establish interstate nexus as to the ammunition underlying both Counts.

For these reasons, the Court **DENIES** Defendant's Motion based on insufficiency of evidence.

### III.    Whether Defendant's Trial was Tainted by Inadmissible Evidence of the Two Shootings

Defendant argues that the Court erroneously allowed the Government to introduce evidence of the shootings of the Chisolms and Johnson that was not intrinsic to his alleged possession of firearms. (Doc. 149, pp. 7–9.) Defendant acknowledges that "[e]vidence to establish the basic facts that (1) the firearm named in the indictment was used in a shooting on November 3, 2018, and (2) the firearm was found in possession of a shooting victim on November 5, 2018, may have been intrinsic to the allegations that [Defendant] possessed the firearm." (Id. at p. 7.) But he contends that the Court allowed the Government to go beyond those basic facts. He specifically complains about the admission of several photographs of the crime scene and the victims and testimony from a "ShotSpotter" Expert. (Id. at pp. 7–8.)

The Court addressed similar arguments from Defendant before trial and correctly concluded that evidence of the homicides was "'inextricably intertwined with the facts of the firearm possession case and [are] needed to explain basic facts, such as why the police swabbed the firearm for DNA, interviewed [Defendant], and sought his cell phone records." (Doc. 88, p. 19 (quoting United States v. Flowers, 531 F. App'x 975, 984 (11th Cir. 2013).) The photos of the November 3, 2018, crime scene helped the jury assess from what area the shots were fired and from where the shell casings were collected. Those photos combined with Desiree Chisolm's and Rowe's testimony proved that the shots were fired from the side of the street and the area of the porch where Defendant stood. This was even more relevant because Defendant argued at trial that

Johnson fired those shots from the other side of the street.  Likewise, the ShotSpotter evidence helped the Government prove the time of the November 8, 2018, shooting.  That evidence, combined with cell phone location data and the video footage from a nearby doorbell camera, placed Defendant at the shooting area when the shots were fired.

Even if the Court erred in introducing this evidence, the evidence did not so affect the trial that the Court would overturn the jury's verdict.  When considering a motion for a new trial based on an alleged evidentiary error, the Court will only order a new trial where "a significant possibility exists that, considering the other evidence presented by both the prosecution and the defense, [the error] has a substantial impact upon the verdict of the jury."  United States v. Riley, 434 F. App'x 818, 821 (11th Cir. 2011) (quoting United States v. Arbolaez, 450 F.3d 1283, 1290 (11th Cir. 2006)).  But "where an error had no substantial influence on the outcome, and sufficient evidence uninfected by error supports the verdict, reversal is not warranted."  Id.  Defendant has not established that improper evidence of the shootings substantially influenced the jury's verdict.  Indeed, he agrees that the Government properly introduced "some evidence" of the shootings.

For these reasons, the Court **DENIES** Defendant's Motion based on the admission of evidence of the shootings.

## IV. Whether Evidence of Text Messages Between Defendant and Johnson Tainted Defendant's Trial

Defendant next challenges the admission of two October 20, 2018, text messages from Johnson to Defendant through which Johnson requested that Defendant's girlfriend buy Johnson a magazine to hold ammunition.  (Doc. 149, pp. 9–10.)  In the first, Johnson messaged, "Man plz go head and get yo girl tew order da pro meg xd 40."  (Gov. Tr. Ex. 156, p. 4.)  In the second, Johnson sent a link to a webpage through which the magazine could be purchased.  (Id. at p. 5.)

Defendant argues the text messages: (1) were inadmissible hearsay; (2) were not relevant; and (3) were more unfairly prejudicial than probative. (Doc. 149, pp. 9–10.)

The parties briefed Defendant's relevance and unfair prejudice arguments before trial. The Court correctly held that the text messages were probative of a fact at issue and that the evidence's relevance was not outweighed by unfair prejudice. (Doc. 112.) At trial, Defendant did not object to these messages. (Doc. 155, p. 207.) Thus, he did not preserve his opposition. United States v. Khoury, 901 F.2d 948, 966 (11th Cir. 1990) ("A defendant must object at trial to preserve an objection on appeal; the overruling of a motion in limine does not suffice."). A plain-error standard of review applies to evidentiary objections that a party fails to raise at trial. United States v. Wetherald, 636 F.3d 1315, 1320 (11th Cir. 2011). Defendant cannot meet that standard.

Even if a more stringent standard applied, the Court finds no error, much less reversible error in the admission of these text messages. As for relevance, the Court explained in its Order on Defendant's Motion in Limine, "when considered with the other evidence presented by the Government, [the messages] tend to show that [Defendant], [his girlfriend], and [Johnson] were interconnected, and that information about firearm accessories, firearms accessories themselves, and firearms likely passed between the three of them." (Doc. 112, pp. 10–11.) The evidence at trial only strengthened this relevance. The jury heard testimony that Johnson and Defendant were close associates, that they often spent time together, and that they were together on the night of both shootings. The jurors saw a photograph of several firearms splayed across Defendant's girlfriend's couch that was uploaded to Defendant's iCloud account two days after Johnson's text message and days before the first shooting. Law enforcement also recovered firearms from Defendant's girlfriend's home. Combined with these pieces of evidence and others, Johnson's messages made it more probable that Defendant had a source of supply and access to firearms and

that he exchanged those items with Johnson.  Particularly considering the close temporal proximity between the messages and the shootings, these are facts of consequence.  Fed. R. Evid. 401.

As for unfair prejudice, the Court's pretrial order explained,

> All relevant evidence in a criminal case is inherently prejudicial to some extent; "it is only when *unfair* prejudice *substantially* outweighs probative value that the rule permits exclusion."  [United States v. King, 713 F.2d 627, 631 (11th Cir. 1983)] (emphasis in original).  "'[U]nfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." Old Chief v. United States, 519 U.S. 172, 180 (1997).

Defendant did not describe before trial, during trial, or in his current Motion, how the text messages could lure the jury to find him guilty on a ground other than the one charged.  While the text messages combined with other evidence tend to show that Defendant exchanged firearm accessories with his girlfriend and his close associate, Johnson, that prejudice is not unfair.

Defendant did not object to the text messages on hearsay grounds before or during trial, and he does not elaborate on his hearsay objection in his Motion.  Even if he had, the messages do not meet the definition of hearsay.  The messages constitute a directive or request for Defendant to do something, not a declaration of fact by Johnson.  See, United States v. Cruz, 805 F.2d 1464, 1478 (11th Cir. 1986) (directive to a drug dealer to bring her supplier to a meeting with the witness not hearsay because the "out-of-court declaration . . . is not an assertive statement.  It is more in the nature of an order or a request and is, to a large degree, not even capable of being true or false."); see also, United States v. Pagan, No. 21-12328, 2022 WL 7811971, at *6 (11th Cir. Oct. 14, 2022) (text messages between defendant and associate arranging drug purchases not hearsay);

Even if the Court erred in admitting this evidence, the messages did not impact the trial such that the Court would overturn the jury's verdict.  See Riley, 434 F. App'x at 821.  These two

messages could not have substantially influenced the jury's decision given the minor role these messages played in the Government's case and the other sufficient evidence of Defendant's guilt.

For all these reasons, the Court **DENIES** Defendant's Motion based on the introduction of text messages from Johnson to Defendant.

## VI. Whether the Court's Exclusion of Defendant's Acquittal on Murder Charges Warrants a New Trial or Acquittal

Defendant argues that the Court "erred again when it denied admission of the fact that [Defendant] was acquitted in state court of chargers (*sic*) related to those shootings." (Doc. 149, p. 10.) The Court excluded that evidence through oral *in limine* ruling. (Doc. 153, pp. 99–101 (citing United States v. Halteh, 224 F. App'x 210, 214 (4th Cir. 2007); United States v. Carpenter, 212 F. App'x 853, 856 (11th Cir. 2006)).) Defendant did not overcome the Government's hearsay objections. See Carpenter, 212 F. App'x at 856 (citing United States v. Irvin, 787 F.2d 1506, 1516–17 (11th Cir. 1986)) ("[u]nlike judgments of conviction, judgments of acquittal are hearsay, are not covered by an exception to the hearsay rule and are generally inadmissible.").[7] Also, whether the State of Georgia proved that Defendant was guilty of different charges in a separate trial is irrelevant to whether the United States proved Defendant's guilt in this trial. Evidence of the acquittal would have unfairly prejudiced the Government, because, if the federal jurors knew of the state jury's verdict, they may have improperly substituted that decision for their own. This evidence would have also needlessly prolonged this trial and confused the jury. For instance, if Defendant had introduced the state acquittal, the Government would have then likely engaged in

---

[7] Defendant makes unsupported and unavailing contentions regarding hearsay. (Doc. 149, p. 10.) Defendant has not cited, and the Court is unaware of, any authority for his contention that the state jury was a "public office," much less that the jury's verdict would meet the other requirements of Federal Rule Evidence 803(8)(A)(iii). Defendant's argument that the state verdict reflects his "state of mind" fails because he was not the declarant of the verdict, and the verdict does not reflect his state of mind at the time it was rendered. See Fed. R. Evid. 803(3). The statement also does not meet Rule 807's residual exception as the Court is unaware of the reasoning behind the jury's verdict.

a "trial about a trial" and introduced evidence of the state trial including differences in the charges and the evidence in the two cases. Lastly, even if the Court erred in excluding the state court acquittal, that exclusion did not so impact the jury's verdict that the Court would overturn their decision.

For all these reasons, the Court **DENIES** Defendant's Motion based on the exclusion of his acquittal on state charges.

## CONCLUSION

Defendant has failed to point out any error in his trial, much less error warranting overturning the jury's verdict. While Agent Vance's falsehoods dismay and disappoint the Court, they did not so infect this prosecution that the Court should grant Defendant relief. The Government presented sufficient evidence for a reasonable juror to find Defendant guilty. He has not shown that any errors independently or cumulatively prejudiced him to the point of violating his right to a fair trial. Consequently, the Court **DENIES** his Motion for New Trial and Judgment of Acquittal. (Doc. 149.)

**SO ORDERED**, this 25th day of March, 2025.

_____
R. STAN BAKER, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA